No. 2662.

## Mack Crook v. The State.

1. Accomplice to Murder—Indictment.—See the opinion in extenso for the charging part of an indictment *held* to comprehend but a single count, and to be sufficient to charge the accused as an accomplice to murder.

2. Same—Evidence—Principal Offenders—Charge of the Court. In order to authorize the conviction of an accused, as an accomplice, it devolves upon the State to establish the guilt of the principal of the offense charged against him; and, to establish that specific issue (but not that the accused is an accomplice), any evidence is admissible that would be competent against the principal if on trial. Under this rule the trial court did not err in admitting proof of the confession of the principal; and, in limiting the purpose of such proof to the issue of the principal's guilt, the charge of the court was correct.

3. Same—Practice—Evidence—Declarations.—The State's witness Holman testified on the trial of the accused as an accomplice to murder, to the acts, declarations and statements of one Harris, and to a conversation between him, the witness, the said Harris, and the alleged principal, to all of which the accused objected upon the ground that he was not present at any of the times testified about, and that it had not been shown that a conspiracy to commit murder existed between him and the said parties. *Held* that this proof in this case was clearly hearsay, and was inadmissible except upon the predicate of the

Syllabus.

existence of such a conspiracy. Whether the proof sufficiently estab-
lished the predicate was, primarily, a question to be determined by the
court; but, the evidence clearly presenting the sufficiency of the predi-
cate as an issue in the case, the trial court erred in failing to submit
that issue to the jury, with instructions to disregard the evidence ad-
mitted unless the predicate was established by other proof. In the
same connection the court should have instructed the jury that a con-
spiracy can not be established by the acts or declarations of a co-con-
spirator, made after the consummation of the offense and in the ab-
sence of the defendant. See the opinion for a special charge on the
subject, which, being correct and demanded by the proof, was errone-
ously refused.

4. SAME—PRACTICE.—Expressions of the trial judge, in the presence of
the jury, with reference to the cogency of the evidence, if prejudicial
to the defendant, and exception is promptly reserved, constitute cause
for reversal. Pending the discussion in the presence of the jury, of
the admissibility in evidence of the declarations of an alleged co-con-
spirator, the trial judge interjected questions to counsel which clearly
intimated that, in his opinion, a conspiracy had been sufficiently es-
tablished to admit the evidence; to which action of the judge the de-
fendant promptly excepted. *Held*, material error. The jury should
have been retired pending the discussion and the ruling on the ques-
tion.

5. SAME.—A prosecuting witness having testified to certain inculpatory
facts, the defense sought to impeach him by proving that he had
made statements contradictory of his testimony on the trial. There-
upon, over objection by the defense, the State was permitted to intro-
duce evidence in support of the good general reputation of the witness
for truth and veracity. *Held*, that the action of the court was correct,
especially in view of the showing that the impugned witness was a
stranger in the county of the trial.

6. SAME—EVIDENCE—PREDICATE.—As a predicate for the introduction in
evidence of the written testimony of one T., as delivered at the exam-
ining trial, it was proved that the said T. resided in the Indian Terri-
tory at the time of the examining trial and at the time of this trial.
*Held* that the predicate was sufficiently established.

7. SAME.—The defense offered to prove by the witness N. the statement
made to him by an one D. to the effect that the gun with which it was
claimed by the State the killing was done was found by D..at a certain
place, which proof, upon objection by the State, was excluded as hear-
say. *Held* that the ruling was correct.

8. MURDER—ASSAULT AND BATTERY—CHARGE OF THE COURT.—The act
of killing, in this case, necessarily included an assault and battery,
and the charge of the court defining murder sufficiently embraced as-
sault and battery, but the trial court, in addition, gave in charge an
independent definition of assault and battery. *Held* material error
because excepted to. Moreover it was matter calculated only to en-
cumber the charge and confuse the jury.

9. SAME—"MALICE"—"MALICE AFORETHOUGHT" —"EXPRESS MALICE."

—A charge of the court in a trial for murder which omits to define the terms "malice" and "malice aforethought"—essential elements of murder—is fundamentally erroneous, and such error is not cured by a definition of "express malice."

10. SAME—"EXPRESS MALICE."—The charge of the court defined express malice to be "where one with a calm, sedate and deliberate mind and formed design kills another," etc. *Held*, erroneous, because it omits to qualify the act as an *unlawful* killing.

11. SAME—ALIBI.—Upon the defense of alibi as applied to the alleged principal, the charge of the court required the jury to believe that the alleged principal was not present at the time and place of the killing. *Held* error, because the effect of such charge was to eliminate from the defense of alibi the doctrine of reasonable doubt.

12. SAME—ACCOMPLICE TO MURDER—VERDICT.—While not essential, it was proper that the charge of the court should instruct the jury as to the forms of the verdict they could return in this case. The form of the verdict, in the event of conviction, as prescribed by the charge in this case was as follows: "We, the jury, find the defendant Mack Crook guilty as an accomplice to murder of the first degree in the killing and murdering of James H. Black, as charged in the indictment," etc. *Held*, correct.

13. SAME.—ACCOMPLICE TO CRIME is a distinct offense, especially defined by our code, and punished in the same manner as the principal offender. Note that Hurt, Judge, dissents from this ruling, and maintains that being an accomplice to a crime is not a specific offense, and that the accomplice is guilty of the offense committed by the principal.

APPEAL from the District Court of Grayson, on change of venue from Lamar. Tried below before A. C. Turner, Esq., Special Judge.

The indictment in this case charges the murder of James H. Black by John Middleton, in Lamar county, Texas, on the sixteenth day of November, 1884, and that the appellant and one Newt Harris were accomplices to the said murder of Black by the said Middleton; the particular acts charged against them being that they did, on the twelfth day of November, 1884, advise and encourage the said Middleton to kill and murder the said Black, and that they did prepare and furnish to the said Middleton a certain gun with which to kill and murder the said Black, and that they were not present at the time of the killing of the said Black. The venue of the cause was changed by the court of its own motion to Grayson county, Texas, in the district court of which county, on the nineteenth day of November, 1888, the appellant was placed upon his separate trial. His trial resulted in conviction as an accomplice to murder of

the first degree, and his punishment was assessed at a life term in the penitentiary.

Sam Strawther was the first witness for the State. He testified that he lived in Paris, Lamar county, Texas, in 1884. The defendant was sheriff of Lamar county in 1883 and 1884, and was a candidate at the Democratic primary election in August, 1884, for renomination, but was defeated by James H. Black, the deceased, his only contestant for the said nomination. He then announced himself as a candidate before the people for re-election to the office of sheriff, and at the ensuing November election was defeated at the ballot box by the deceased, the nominee of the Democratic primaries. Newt Harris, J. M. Yates and Lewis Holman were deputy sheriffs under the defendant during his term of office. Harris was also jailor and had the custody of the jail keys, and with his family resided in the residence part of the jail building. The said Harris is now dead.

Doctor Haden testified, for the State, that he lived in Paris, Texas, and was county physician of Lamar county during the year 1884. As such physician he attended John Middleton, who was then confined in the Lamar county jail on a charge of horse theft. Middleton was suffering from an acute attack of diarrhœa, and some time prior to September 23, 1884, the witness, apprehending danger to his life by continued confinement in the cells, advised his removal to the residence portion of the jail, and procured an order for such removal from County Judge Moore. Newt Harris was then the deputy sheriff in charge of the jail, and he and his wife, who resided in the jail, waited on the said Middleton after his removal from the cell to an upstairs room. The witness last saw Middleton when he went to the jail to attend him on September 23, 1884. When he went to see him on the next day he learned that he, Middleton, had effected his escape on the preceding night. Prior to the removal of Middleton from the cell to the upstairs room, Jailor Harris expressed to witness his opinion that Middleton would die if kept in the cell, in which opinion the witness concurred. Harris then said that he thought Middleton ought to be removed to and guarded in the upstairs rooms, and the witness agreed with him.

Cross examined, the witness said that he procured the order for the removal of Middleton from the cell to the upstairs room under the belief that longer confinement in the cell was

perilous to his life. He had no idea that Middleton would or could attempt to escape, when he advised his removal. On the contrary. when, on the morning of September 23, 1884, Deputy Sheriff Yates told witness that the defendant was fearful that Middleton would escape, and wanted him returned to the cell, the witness replied that he did not think it physically possible for Middleton to get away, but that, if defendant feared the escape of Middleton, he had better return him to his cell, though his recovery would be greatly retarded by so doing. Defendant went to Sherman on that day in pursuit of a man accused of an offense.

Mrs. Ella Black, the widow of the deceased, testified for the state, that her husband was killed about seven o'clock on the night of November 16, 1884. He was killed by a gunshot, at his house in Blossom Prairie, Lamar county, Texas—the said Blossom Prairie being a small town on the railway about ten miles east of Paris. The house occupied by the deceased, witness and their children was situated on the north side of the railroad and near the depot. It was a double box house of two rooms, with a stack chimney between the rooms. It fronted south, and had a south door in each room. The west room was the one occupied as the family room. The children's bed was across the door at the south side of the house. A lamp was burning in the said west room at the time of the assassination. At about seven o'clock on the night of November 16, 1884, the said night being dark according to the recollection of the witness, some person called "hello!" at the gate. Deceased passed through the partition door to the south door of the east room, and some person asked: "Is Mr. Black in?" Deceased replied: "Yes." A shot was immediately fired, and deceased returned to the west room, sank to the floor, near the bedstead, and expired immediately, without having uttered a syllable. The witness did not see the shot fired, nor did she know who fired it.

H. L. Byrn testified, for the State, that he lived at Blossom Prairie in 1884, in a house quite near the house of the deceased. The contest for sheriff of Lamar county, at the election of 1884, between the defendant and the deceased was a very exciting and bitter one. It produced a hostile feeling between the two candidates which culminated in a personal encounter between them in Faught's drug store, in Blossom Prairie. The witness was not positive as to the date of the encounter, but thought it

occurred after the struggle at the primary election for the nomination, and he knew that it occurred before the general election. He did not witness the encounter, which only amounted to a fist fight, being engaged in his store at the time, but he understood that it grew out of a statement during the canvass imputed to the deceased. The witness was at his home on the fatal night, and heard the fatal shot fired. He went at once to the house of deceased, who was dead when he arrived. He had been shot in the breast, and several shot had entered the door facing on the east side of the east room. Other parties soon reached the house of deceased, when the witness, accompanied by Mr. Cooper, procured a lantern and proceeded to look for tracks. He found the tracks of a horse near the front gate, immediately in front of the house. The said tracks showed that the horse sprang forward at that point, whence it continued in a run. The said tracks showed that horse to have been a medium sized animal. At another point, about fifteen steps from the gate, the witness found the tracks of another horse. The tracks of the two horses came together at a point about thirty five yards distant from the gate, and traveled in company as far as the witness was able to trail them. From the gate they went east around the deceased's fence, thence north one block, and thence west. They went, as far as trailed, two and a half miles to a branch, towards Paris, over what was known as the "timbered" road. Witness traced the tracks a second time with W. D. Nelson and others. He then found that the tracks went out Main street a short distance, then left the street, went around through an alley and came back into the Paris and Blossom Prairie road, which they followed to the fork. The left hand at the fork led to Paris by the prairie route, and the right hand to Paris by the timbered road. The tracks took the right hand at that fork. The said road forked again about a mile from the Blossom Prairie depot, the left hand leading to Paris, and the right hand to Shockey prairie, in the direction of Slate shoals, on Red river. The horse tracks took the right hand at the last mentioned fork, where it seemed they left the road, and witness trailed no further. Others of the party followed the said road a short distance further, but lost the tracks. The country where the witness lost the trail was covered with black jack and post oak brush. The witness was not acquainted with, and, so far as he knew, had never seen either John or Jap Middleton.

Cross examined, the witness said that he was not present at the fisticuff between defendant and deceased referred to on direct examination, and was not able to state positively whether the public speaking at which it occurred was before or after the primary election. The horse tracks mentioned by witness showed by measurement to be the tracks of two different horses. One of the said horses had a shoe on one of its hind feet. They came together at a point about thirty five yards distant from the house of the deceased, and traveled together as far as the witness trailed them. The tracks of the horses showed that they came into Blossom Prairie by the same road over which they left it. The larger of the tracks were those nearest deceased's gate.

Tom Nichols testified for the State, that he knew the defendant and Newt Harris and John Middleton. He saw John Middleton while he was confined in the Lamar county jail. and once after his escape from the said jail. The time last referred to was between eight and ten o'clock at night, during the progress of one of the Democratic demonstrations which followed the presidential election of November, 1884.. On that occasion he passed Middleton at the corner of Lynch's stable, on the block south of the court house in Paris. He did not speak to Middleton, but went on to the White Elephant saloon, at which place Newt Harris was then employed as bar keeper. Newt Harris and Sam Smith, who was in the saloon that night, had some talk about the deceased. The witness did not know the nature of the defendant's feelings for the deceased. The witness supported the defendant for re-election both at the primary and at the polls. Sam Smith, who was a deputy sheriff, also supported the defendant. On his cross examination this witness stated that he and Middleton bowed or nodded to each other as they met and passed on, but did not speak. To Harry Boyd, who was with witness, the witness remarked: "There goes a jail bird," but he said nothing more. Middleton went on towards the court house, in which the Democratic glorification was being held. The witness never told any person about meeting Middleton on that night, although he knew that Middleton was an escaped prisoner. He said nothing about it in his testimony on the habeas corpus trial of Harris, because he was not asked about it. On the said night Middleton was wearing gray colored pants, a dark coat and a dark colored

slouch hat. At that time Harris was living in the residence part of the jail.

Mrs. Laura Williams testified, for the State, that, in the fall of 1884, she lived on Emberson prairie, nine miles northwest from Paris. John Middleton, whom the witness knew well, came to her house between nine and ten o'clock on the thirteenth day of November, 1884, got his breakfast, had his horse fed and then left, traveling north a short distance, and then east over a road that forked at a point beyond where the witness last saw him, one of which said forks led to Paris, and the other to the river. He was then wearing a gray suit of clothes and a brown slouch hat, and had a black overcoat tied behind his saddle. He was about twenty-eight years old, and wore a mustache about an inch and a half long. He was riding a light sorrel horse with a star or spot in the forehead. The horse was then in medium condition, and was apparently a good animal. His saddle was of yellow leather. Middleton had dark hair. His mustache was of a lighter color than his hair.

Mrs. C. E. Pickard testified, for the State, that in November, 1884, she lived on the Paris and Clarksville road, about three miles east of Paris. She was at home on the night that deceased was killed. She started to the house of Mrs. Mary Hunt, two miles north of her place, between nine and ten o'clock on the morning after the killing, taking her daughter with her, and traveling a neighborhood road. En route the witness's daughter called her attention to a horse, under saddle, standing a short distance off the road. Thinking that perhaps the animal had escaped from some of her neighbors, she walked towards it to examine it. As she approached she observed that the animal was tied to a bush, and about the same time she observed a man stooping down at the root of a tree, from which a faint smoke was ascending. He was looking back at her over his shoulder, his back being towards her. The horse was a bright sorrel animal with a star or blaze in the face. A dark colored overcoat was spread over the saddle, to which was attached what the witness took to be a gun scabbard and a provision bag. The man wore gray colored clothes and a brown slouch hat, somewhat worn. Witness only saw his side face, and was unable to say whether he had a mustache or not. He appeared to be between twenty-five and thirty years of age. Witness remarked to her daughter: "There is a man; I guess

it is his horse." The man said: "I can't imagine what you are up to." Witness replied that she thought the horse belonged to a neighbor and had escaped, adding: "I suppose it makes no difference." He replied: "It's all right with me if it is with you."

Cross examined, the witness said that she described the man and horse to some gentlemen on the next day, but could not say that Mr. Roland was or was not one of those gentlemen. Something may have been said about the horse belonging to Charley Moore, but witness had no recollection of it. W. D. Nelson, John A. Gose, Mr. Tiernan and Jake Duncan came to witness's house after the arrest of defendant and Harris, and witness pointed out to them the place where she saw the man and horse.

Tom Buckner testified, for the State, that he lived in Paris, and was bar tender in Schilling's saloon in November, 1884. The said saloon belonged to the Schilling brothers and the defendant. The latter, however, had nothing to do with the management of the said saloon. Some time in November, 1884, Jim Simpson, alias "Kicking Jim," who subsequently died in jail, brought Captain Parish's double barreled shot gun to the saloon and left it, remarking that it had been taken from Parish, who was drinking. The gun remained in the saloon several days, standing at times at one end of the counter and at times at the other end. The saloon had the front doors on the west end. The center (counter?) was on the north side of the house, and there was a screen between the outside doors and "the house where the bar was," and there was a screen door between the north wall and the west end of the counter. The witness did not know when nor by whom the gun was taken away. Captain Parish came into the saloon one day, while sober, and recognized the gun, and requested witness to take care of it for him.

L. B. Enlow testified, for the State, that he lived in Delta county, Texas. He was in Paris purchasing goods on the eleventh day of November, 1884. He and C. D. Rogers went to Schilling's saloon between ten and eleven o'clock on that night and got into a conversation with Henry Schilling while standing at the stove, which was some distance from the front of the house. While thus engaged the witness saw a man reach his hand through the screen door and attempt to seize a gun. He failed in that effort and appeared to be watching the witness.

Witness then turned his head as though not observing the man, when he thrust his hand through the door a second time and got the gun. The witness then called the attention of Henry Schilling and Rogers to the fact that the man had taken the gun. Fifteen or twenty minutes later the man who got the gun came into the saloon where witness was, and the witness learned that his name was Mack Crook. That man was the defendant. When removed, the gun was at the west end of the counter, next to the screen leaning against the shelving.

This witness, on his cross examination, stated that he was at the depot in Paris on the day in 1886 when the witnesses in this case went to Sherman. He was drinking on that day, but had no recollection of drinking with the defendant. He had no recollection of saying on that day, in the presence of Andy Gray, J. B. Belcher and Sam Smith, that Mack Crook was not the man he saw take the gun from Schilling's saloon. If he made any such statement it was not true. The witness remembered nothing that occurred at the depot, except that he had a "little row" and a "tussle" with a policeman, who took a pistol away from him.

C. D. Rogers testified, for the State, that he was in Schilling's saloon with the witness Enlow on the night referred to by Enlow. Enlow called witness's attention to a man who, he said, was trying to take a gun through the screen door from behind the saloon counter. Witness saw no effort by anybody to remove a gun, but saw, through the slats of the screen, the outlines of a man in the front part of the house. Some minutes afterwards that man came into the saloon, and Enlow remarked: "That is the man who got the gun." The witness did not know that man, and could not identify the defendant as that man.

Lewis Crook testified, for the State, that his brother, the defendant, was in Hot Springs, Arkansas, at the time the deceased was killed. Witness telegraphed him that the deceased had been killed by unknown parties, and he returned to Paris by the next train.

Sam Strawther, recalled by the State, testified that Lewis Holman went home with him to tea on the fatal night. Early in the night Newt Harris came to witness's house after Holman. He said that he had just received a telephone message from Blossom Prairie to the effect that the deceased was killed; and he and Holman left witness's house together. A day or two before the arrest of the defendant and Harris, the defendant

came to witness and asked witness if his son-in-law Jim Good-
join or Lewis Holman were in town. Witness replied that
Goodjoin was in town unless he had left within a very short
time. He then said: "If you see Goodjoin, tell him to tell
Lewis Holman to come to town, as I want to see him." Good-
join at that time was merchandising on Emberson prairie, and
Holman was in his employ.

James Goodjoin testified, for the State, that Lewis Holman
was a deputy sheriff under the defendant. He went out of of-
fice with his chief, and entered the service of the witness, who
was a merchant on the Emberson prairie. A few days before
the arrest of the defendant the witness met the defendant in
Paris, when defendant asked the witness if Holman was at his
store. Witness replied that he was, and defendant requested
witness to tell Holman to come to Paris to see him, and to
come prepared for an absence of at least ten days. He left the
impression on the mind of the witness that he wanted Holman
to help him get up some cattle. Witness delivered the mes-
sage, and Holman went to Paris, and was not again seen by
the witness until after his arrest.

Frank Morris testified, for the State, that some time between
the primary and general election in 1884, he heard the defend-
ant, speaking of deceased, say: "I will bet five hundred dol-
lars that the d—d son of a bitch will never be sheriff of Lamar
county."

J. M. Yates was the next witness for the State. He testified
that he was a deputy sheriff under the defendant in 1884. He
was office deputy in November, and from September until the
close of defendant's term, was jailer. John Middleton escaped
from custody on the night of September 23, 1884. The de-
fendant was at that time in Sherman, and Jim Crook and Newt
Harris were on the river with a prisoner in custody. Defend-
ant was not in Paris when Middleton was removed from the
cell to the upper room in the jail. As he was leaving for Sher-
man on the morning of September 23, the witness spoke to him
about the removal of Middleton from the cell. He appeared
to be angry about it, and directed witness to ask Doctor Haden
if Middleton could not be returned to the cell. He said he "did
not want any d—d horse thief to get away from him." The
witness saw Doctor Haden about the matter. The doctor ob-
jected, and said that, though the man had better be returned to
the cell if there was danger of his escape, he did not believe

that he could survive re-incarceration in the cell. When Harris left Paris on that morning he delivered the jail keys to the witness, and it was on the night of that day that Middleton escaped. Witness wanted to remain at the jail that night, but Mrs. Harris objected, and he went off. On the return of Harris to Paris. the witness sent him to Red river in pursuit of Middleton, but he failed to find him. The defendant soon returned from Sherman, and went immediately to Bonham, where, he said, he heard of a man whom he thought might be Middleton. Returning from Bonham unsuccessful, he went to Red river, in the neighborhood in which Middleton's relatives lived.

Continuing his testimony, this witness said that he remained in the sheriff's office until Sheriff Gunn qualified, after the death of deceased. Deceased came to Paris to qualify on Saturday—the day before he was killed—but a formal defect being found in his bond, he postponed assuming charge. He, however, went through the office and inspected the jail, told witness that he would take charge on Monday, and requested him to retain a deputyship until he familiarized himself with his duties. Defendant went to Hot Springs, Arkansas, on ·the Tuesday or Wednesday preceding the fatal Sunday night. He went to the Indian Territory a few days before that, in pursuit of a criminal. Witness knew nothing of his visiting the house of Threlkeld in the Nation on that trip. Lewis Holman was the first person to inform the witness about the killing of deceased. A short time after the killing of Black a letter addressed to the sheriff of Lamar county was received—defendant at that time being absent. The envelope enclosed two letters, one addressed to the defendant and one to Harris. Witness delivered the two letters to Harris, and on the return of defendant told him that Harris had the letters, but had no other talk with him about the letters. The said letters were signed either "Cross" or "Collins," and came from Briarton, Indian Territory. On or about February 10, 1885, the witness received a letter addressed to him, post marked and addressed from Wamego, Kansas, and signed "John Howard." After reading the said letter, and finding it to refer to the killing of Black, the witness became afraid that it would involve him in trouble. Acting upon that fear, he took the letter to Schilling's saloon, where he found the defendant, and he and defendant read the letter and discussed it, after which the witness burned

14

it.  As soon as he read the letter the defendant said:  "That
d—d fellow has been writing to this country for some time;
they will get him; he will give the whole thing away, and then
I will have trouble."  The witness understood the letter to be
from John Middleton when he spoke of "that d—d fellow,"
though he could not now say that Middleton's name was men-
tioned in the conversation.  The witness asked defendant what
he should do about the letter.  He first advised that no atten-
tion be paid to it, but upon reflection concluded that the witness
had better answer it, and so advised.

The witness was able to recall some parts of the letter from
Howard.  It asked if "old Joe had given him away;" wanted
information as to who was sheriff, and if the sheriff was a
friend of the defendant.  It requested witness to "tell Newt I
will send that present soon;" the said present, according to the
explanation of the defendant, being a gold watch which, the
defendant remarked, he "guessed was stolen by the fellow."
Defendant then advised the witness to answer the letter and
advise the "fellow" to leave the country and go to Mexico; but
to keep track of him.  "Old Joe" mentioned in the letter was
a negro "trusty," who was under conviction for a felony, and
whose case was on appeal.  The letter now exhibited in evi-
dence is the letter written by the witness in reply to the said
"John Howard" letter.  It was mailed by the witness on the
train, as advised by the defendant.  Some time after this, and
before the arrest of defendant and Harris, the witness met the
defendant in Schilling's saloon, where he said to witness: "I
have got another letter from that d—d fellow."  Witness asked
him "what fellow?" and he replied: "The same fellow you got
the letter from."  He then said: "I don't know what to do."
Witness asked him what was in the letter, and he replied:
"The fellow is writing back here that all of his friends have
gone back on him, but one there where he was, that was a
friend."  Defendant presently said: "I have got to get that
d—d fellow out of the way, for if they get him I will have
trouble."  He then asked witness if he could find the fellow.
Witness replied: "I think it will be a hard job.  He only had a
mustache when he got away, and from all I can hear he now
has beard all over his face."  Defendant then asked if witness
thought Lewis Holman could be relied on.  The witness re-
plied that he did not know, and then added: "Mack, I don't
want to be mixed up in this affair, for I did not know anything

about it." Defendant replied: "Yes, this is one thing you did not know anything about." Defendant then asked what the witness was going to do. Witness replied that he wanted to go to his farm and go to work. Witness then said that he wanted to see Holman, and defendant loaned him a horse to go to Goodjoin's store on Emberson prairie for that purpose. He told witness to tell Holman that he wanted to see him, and to come prepared to be absent a week or ten days, which message the witness delivered to Holman. He never saw Holman again until after he, Holman, was arrested. A few days before the killing of Black, the witness met the defendant on the court house steps in Paris, when defendant asked witness if he thought John Middleton had been in the vicinity of Paris since his escape. Witness replied that he thought not; to which the defendant replied: "If he has, it was for a purpose." Witness remarked: "He might try to kill Bill Nelson, as he has threatened to do." Defendant then said to witness: "If you run up on Middleton don't try to arrest him unless you get the advantage, or you might get killed." Defendant appeared anxious and "flustrated" by the Howard letters, and, referring to the last one received by him, remarked: "I will have trouble over this matter, yet." Witness understood this remark to refer to the killing of Black."

The defense, on cross examination, read in evidence the letter addressed to "John Howard, Wamego, Kansas," admitted by the witness to be the letter written by him to John Middleton. It reads as follows:

*"Dear Friend:*

I am just in receipt of a letter from you. Was glad to hear from you. Hope you may soon recover from your afflictions, so you may be able to ride again. You may be assured that I am just as you regard me to be, and am glad you view it in the light as you express yourself. The question of the money you speak of is true, only more so. But I give you no name of the parties; and some persons are working for it and have made some long trips. The party you asked about giving away, he was not the one. He left the country. But I am credibly informed it was some one of your relatives. Do not know which one. I can't say the party is uneasy, but there has been a great deal said. As the next time will soon be here I am looking for another siege of investigation. The citizens

Statement of the case.

made up the amount and placed it in the bank (standing.) The party you asked about is no friend, as he was a friend to some one else, and the party is blamed by some people to some extent. Do not go among your relatives, as they are closely watched. I can't advise you to ever come back to Texas, although I would like to see you very much, and would say many things I can't write. I use no names for fear of accident. I have not seen any of the boys you were best acquainted with, for some time, as some people are very curious, you know. You must be on the alert and keep a close watch, or some gal might get away with you. In our correspondence we must use no names. First letters will be sufficient. I hardly know how to do to keep my own folks from knowing we have any correspondence, as they sometimes open my mail, and I assure you I want all this kept very close; and be sure you destroy this as soon as you get it, and I will do the same. If you should ever want to visit Texas, I want you to write me what time and place, so I may see you, though I can't advise you to do so. I think if I was a young man and had no encumbrance I should like to go to Mexico, although that seems out of the world almost. I believe this is all I can now write. Do not mail your letters where you write from, and use no name unless you want addressed different from this one. Take care of yourself *and be a good boy.*

"Yours forever & etc.

"February 10, 1885.                    From your friend."

"Write once in a while so I may keep you posted about all the girls, and may be so they may forget the past. *You know.* The principal man you asked about is named Bill Gunn."

Continuing, under cross examination, the witness said that prior to the writing of the above letter he had been told by Lewis Holman that John Middleton killed Black, and that the defendant had nothing to do with it, and had no connection with Middleton in the killing. Defendant had nothing to do with the composition of the letter in evidence, and never read it. It was the individual production of the witness. When writing that letter the witness thought he was writing to the man who killed Black, and that that man was John Middleton. It was on the Saturday after Sheriff Gunn took charge of the jail that Holman told witness about the killing of Black by Middleton. He told witness in that connection that defendant

had nothing to do with the killing of Black, and knew nothing about it, and that "it was all Newt Harris." The witness never divulged what Holman told him until he was confronted with the letter in evidence which he had written to Howard. On the day he was confronted with his letter, the witness received a note from Sheriff Gunn, inviting him to the office. When he entered the office he found Sheriff Gunn and Jack Duncan, the detective, and was told by them that they had caught John Middleton, who had "given the whole thing away." They then showed witness the letter he had written Middleton. Witness then told Gunn and Duncan all he knew which had been told him by Lewis Holman. It was understood, before the witness testified on the examining trial, that he would not be prosecuted. On the day after he was shown his letter, the witness met Bill Nelson and told him that he was "in it, and did not know whether or not he could swear enough to save himself." The witness had no recollection of telling Jerry Crook and Bill Nelson that defendant knew nothing about the purpose to kill Black. He did tell them that he did not think defendant knew anything about it. He thought then, and thinks yet, that defendant had no knowledge of, nor part in, the plan, and no connection with the murder. Defendant announced a reward of fifty dollars for the capture of Middleton as soon as he learned of his escape. About the time Middleton escaped, defendant and Harris had a falling out, when Harris quit the service of the defendant and went to work for Dave Moore, in the White Elephant saloon.

On re-direct examination the witness stated that that part of the letter in evidence which speaks of money was in answer to inquiries in Howard's letter about a reward being offered for the capture of Black's murderer. That part about parties having made trips was in reply to questions in Howard's letter which spoke of Sheb Williams going to the Indian Territory, and offering a reward of a thousand dollars for the arrest of Middleton. When Jack Duncan showed witness the letter in evidence he remarked that Middleton had confessed, and that witness knew all about the killing of Black. Witness replied: "That is a lie. I know only what I have told you and Mr. Gunn." In fact the witness knew no more, and it was for that reason that he told Nelson that he did not know whether or not he could swear enough to save himself.

Sayton Ashford testified, for the State, that he lived two

miles west from Blossom Prairie, in Lamar county. About a year after the killing of Black, the witness and Jeff Sisson went cow hunting in the vicinity of Reno, a station on the Texas and Pacific railway, about half way between Paris and Blossom Prairie. At a point about a half or three-quarters of a mile north of Reno, they found an old rusty, muzzle loading shot gun. It was hanging in a black jack tree by a leather strap. Witness did not know who owned the gun nor who hung it in the tree. They took the gun home, and on the next day Sisson and Benton East took it to Paris.

W. H. Roland testified, for the State, that some time after the killing of Black, Jeff Sisson, accompanied by Benton East, brought an old rusty, muzzle loading shot gun to his house in Paris. Witness took that gun to Colonel Cooper's shop. Cooper examined it and then delivered it to sheriff Gunn. Captain Parish afterwards saw the gun and claimed it as his property. On his cross examination the witness stated that he did not recollect testifying as a witness on the inquest upon the body of deceased, nor that on that occasion he described Charley Moore and his certain sorrel horse, or that Mrs. Provine, now Mrs. Pickard, claimed to have seen a man in the woods, on the morning after the killing of Black, who corresponded with the description of Charley Moore, and that he had a horse which corresponded with the description of Charley Moore's horse. Being shown the record of his testimony as delivered upon the inquest, the witness identified his signature and acknowledged it as his testimony. It was then read by the defense as follows: "Charley Moore is about thirty years old, and will weigh about one hundred and fifty pounds. I am reliably informed that Charley Moore left Cavines's on Emberson prairie, ten miles north west of Paris, the day before Black was killed, riding a bright sorrel horse with a star in the forehead. He told parties when he left that he was going to the Nation to buy hogs. He was seen five miles east of Paris, on the Pine Bluff road, on Sunday evening—the evening Black was killed. Mrs. Provine informed me that, on the next day after Black was killed, she saw a man on a sorrel horse in the woods, about three miles east of Paris, which Henry Evans thinks suits the description of Charley Moore and his horse. Harvey Young-blood told me he heard Sam Smith say that Black would never be sheriff of Lamar county."

Continuing on his cross examination, the witness said that

he did not go with Bill Nelson to Mrs. Provine's house.   Mrs.
Provine's said house was about three miles east of Paris, and
about the same distance west of Reno.   Reno was about five
miles west from Blossom Prairie.   The citizens of Lamar
county subscribed a fund to be paid as a reward for the appre-
hension of the murderer of Black.   Detective Jack Duncan
was employed to discover the murderer.   The next day and
night, and for several days and nights, several large parties of
citizens scoured the country in search of the assassin.   Wit-
ness and John Milsap hunted the western part of the county.
Intense excitement prevailed throughout the county.   On his
re-direct examination the witness said that Doctor Rush told
him about meeting Charley Moore on the Pine Bluff road on
Sunday evening.   Investigation showed that Charley Moore
spent the fatal night on the Pine Bluff road, four or five miles
east of Paris.   The said Pine Bluff road was north of the Paris
and Blossom Prarie road.

C. H. Schilling testified, for the State, that he was one of the
proprietors of Schillings's saloon, in Paris, Texas, in Novem-
ber, 1884, in which concern the defendant was then a silent
partner.   Witness knew nothing about Captain Parish's gun
ever being in that saloon or taken away from there.   Newt
Harris worked in that saloon as bar tender in July, 1884, but
quit just after the primary election, and was about the place
but little afterwards.   Defendant was often in the saloon when
not busy at his office.   He was at liberty to go behind the
counter, but rarely did so at that time.   The witness did not
know whether or not defendant and Harris were particular
friends, nor did he know whether Harris supported or opposed
defendant at the said primary election.   Guns were often left
and kept in the witness's saloon, but witness could not say that
he had ever seen or had not seen Parish's gun in that saloon.

Upon the admission of the defendant's counsel that John
Threlkeld lived in the Indian Territory at the time of this trial,
and at the time of the examining trial in February, 1885, the
State read in evidence the record of his testimony as delivered
on the said examining trial.   The substance of that testimony
was that the witness heard of the killing of Black on the
morning after it occurred—being Monday morning.   On the
preceding Wednesday the defendant came to the witness's
gin in Kiomitia county, Choctaw Nation, I. T.   He road up to
the gin from a northwest direction.   Witness shook hands with

him and asked him what he was doing in that neighborhood. He replied that he had been into Arkansas, but did not say what he had been there for.  Witness then told defendant that he understood that John Middleton was at the wagon yard in Paris on the preceding Thursday night.  Defendant replied that he did not think that information could be true.  Witness replied that it was his understanding that his uncle, Doc Middleton, saw him on that night.  Defendant remarked that it was strange he was not captured if in fact he was at the wagon yard, and that if he, defendant, had been in Paris on that Thursday night, and John had gone to the wagon yard, he would have secured him.  Witness then told him that it was also reported that John Middleton was at his father's house on Friday.  He replied that he doubted the truth of that report, as he had a deputy named Charley Johnson in that neighborhood who most probably would have captured him.  Defendant remained at the gin about an hour, either just before or just after noon, and left over the Golden Bluff road towards Paris.  He was alone and was traveling on horseback.  The witness next saw the defendant and Captain Sam Johnson in a wagon near Golden Bluff.  That was on the Friday after the killing of Black, the witness then being on his way to Blossom Prairie to attend the inquest.  Defendant was at witness's house on the next day, when the witness delivered to him a bale of cotton in settlement of a debt he owed him.  He then left for Paris with the cotton.

Wesley Cooper testified, for the State, that W. H. Roland and Mr. Milsap brought a rusty muzzle-loading shot gun to his, witness's, blacksmith shop, in Paris, some time in 1885.  Wit ness identified it as a gun he had often worked on, and as often borrowed for use from Captain Parish.  Parish afterwards claimed it.  A gun will look as old and rusty from exposure to the weather for a few days as it will from such exposure for a long time.  Witness could not tell how long that gun had been exposed, but it was very rusty.

Sheriff Gunn testified that an old rusty muzzle-loading double-barreled shot gun was brought to his office in 1885 by either Roland, Sisson or Milsap.  Witness put that gun in the Farmers' and Merchants' Bank, and afterwards delivered it to Captain Parish, who claimed it.

On cross examination this witness stated that the assassination of Black created profound excitement throughout Lamar

county, and led to the organization of large bodies of citizens, who scoured the country in search of the assassin. A large sum of money was subscribed and offered as a reward for the apprehension of the guilty party or parties. A detective named Jack Duncan, who lived at Dallas, was employed and put to work on the case. Witness knew nothing about Duncan visiting Blossom Prairie in connection with the murder, but knew that he and others went to the woods to look for a gun after the arrest of defendant and Harris. Duncan also went with the witness to arrest defendant and Harris. On Sunday, February 21, 1885, the witness, at the request of Duncan, sent for Yates to come to the sheriff's office. When Yates got into the office the witness showed him the letter to John Howard, and Yates admitted that he wrote it to John Middleton. He then told witness and Duncan about what he has testified to on this trial. He was then kept about the jail building until the following evening, and in fact pretty much all of the time until the following twenty-sixth day of February, when he testified on the examining trial. The letter to Howard was given to the witness by Duncan. According to the recollection of the witness, Duncan told Yates that he had caught John Middleton and secured his, Yates's, letter. It was agreed that no person would be permitted to talk to Yates until Monday evening. One of the attorneys for the prosecution objected to permission being granted to J. G. Dudley to see Yates. Upon that objection Dudley refused to see Yates.

Re-examined, the witness stated that Yates did not ask to see a lawyer until about the time of the examining trial, when he asked to see J. M. Long, one of the defendant's attorneys. No objection was interposed to Yates seeing an attorney after the examining trial commenced. Duncan started to Kansas on Tuesday after the arrest of defendant and Harris.

J. W. Ownby testified. for the State, that he was county attorney of Lamar county in 1884 and 1885. Some time after the killing of Black the defendant called on the witness to consult him about the sheriff's office. He wanted to know whether, Black never having qualified, his death would necessitate another election for sheriff, or would require him, defendant, as the incumbent, to hold over. The witness could not say that defendant sought his advice with the view of holding on to the office. Witness was interested to the extent that he did not want criminal process returned to his office, worthless because

served by an illegal sheriff, and consequently, in connection with Captain Hale, investigated the question. As a result, he wrote to the Attorney General, who replied by citing to him certain decisions of the Supreme Court on the question. Defendant, at first, did not want to retain the office of sheriff, but when rumor got to connecting his name with the assassination of Black, he declared that he had no connection with the killing, and that he would hold on to the office if he could legally do so. Defendant's name was, to some extent, coupled with the murder of Black as soon as he got back from Hot Springs, and before his arrest.

Doctor J. F. Hooks testified, for the State, that Charley Moore lived on Emberson Prairie, about nine miles northwest from Paris. He came to witness's office quite early on the morning after the murder of Black, to get witness to dress his sore arm. It was then, the witness thought, much too early for Moore to have ridden from his home to town on that morning. He went from witness's office toward the public square, riding a sorrel horse with a star in the forehead.

R. J. Patton, testified, for the State, that he went into Schilling's saloon in Paris early on the night of February 10, 1885. As he stepped into the front door he heard the name "Middleton" spoken by some person. As he passed into the saloon he saw the defendant and the State's witness Yates behind the counter, talking in a low tone of voice. Yates had a letter and a buff colored envelope in his hand. Witness heard nothing said by either of the parties.

J. A. Booth testified, for the State, that the candidates before the primary election in 1884, for the democratic nomination for sheriff of Lamar county, were the defendant, the deceased, Jack Wooldridge and himself. The only candidates before the people at the general election in November were the defendant and the deceased. Pending the campaign after the primary election the witness heard the defendant say that Black should not talk about either him or his friends, and that Black would never be sheriff of Lamar. By this last remark the witness understood defendant to mean that he would defeat Black at the polls. Black, who, after the election, employed witness to take charge of the jail, came to Paris on the fifteenth day of November, and, together with witness, was shown through the jail by Yates. He left town on that evening and was to return

and qualify on the following Monday, November 17. Witness did not know where Yates was on the night after Black was killed.

Tom Christopher testified, for the State, that he was arrested in Lamar county, in 1884, on a charge of forgery. He was released on bail, with the deceased as one of the sureties on his bond. Deceased subsequently surrendered the witness on the bond, and witness was again placed in jail at Paris. John Middleton was then in jail under indictment for horse theft. One day the witness got to talking with the defendant about his surrender by Black, and among other things said to him that when he got out he intended to find out from Black why he surrendered him. Defendant said to him: "If a fellow was to set up two or three hundred to you, you would set Black up when you get out, wouldn't you?" Witness laughed a little by way of reply, and John Middleton, who was present, said: "I would." The witness several times after that saw the defendant and John Middleton talking privately, but never heard what passed between them. The witness was acquitted of the charge of forgery, and at the time Black was killed was living on Pine Bluff street in Paris, about half a mile east of the court house. Just after dark on the first or second night after the killing of Black, the witness, then on his way home, met John Middleton on Pine Bluff street. He was going west, toward the court house. He recognized witness and called him to the middle of the road, where he was on his horse, which was either a sorrel or light bay animal. When witness reached him he told witness that he had killed Jim Black, and wanted to know if Newt Harris was at the jail. Witness replied that he did not know. He then asked if witness knew where Bill Nelson was. Witness replied that he did not. He then wanted to know if witness could find Bill Nelson, and said that, having killed Jim Black, if he could get Nelson out and kill him, they could break his d—d neck for all he cared.

Cross examined, the witness stated that he had never testified before in connection with this case. He told Sheriff Gunn, Larkin Hunt and Bill Nelson what he has now testified long before the arrest of the defendant for the murder of Black. At the time of the examining trial of the defendant and Harris, the witness asked Gunn not to place him on the stand, as it would "give him away" to Middleton, who was still at large. The point where the witness met Middleton on the first or second night after the killing of Black, was about five hundred

yards distant from the public square in Paris. He called witness to the middle of the street, told him that he had killed Black, and asked him if he, witness, could get Nelson out for him. Witness replied that he could and would. As they separated Middleton said to witness: "You will stick to your promise and help me kill Nelson?" Witness replied that he would. Witness then and there agreed with Middleton to help kill Nelson, and renewed the agreement made with him in jail, that they would adhere to each other through life, with the understanding that if either "went back" on the agreement he should be killed by the other. Defendant had no part in nor knowledge of the agreements between witness and Middleton. No agreement was entered into while in jail to kill defendant and Nelson. The witness denied that he ever told Larkin Hunt, W. D. Nelson, D. E. Booker or J. M. Long that Middleton was mad at Nelson for arresting him, and that he, witness, was mad at Black for surrendering him on his bond, and that he and Middleton had agreed in jail that Middleton was to kill Black for him and he was to help Middleton kill Nelson, and that defendant had never talked to him about Black. He did not tell Hunt that he thought a man named Brinley, who was confined in jail for a time, was with Middleton when he killed Black.

Re-examined, the witness stated that, when he entered into the agreement with Middleton to get Nelson out and help kill him, he had no intention of doing it. He agreed because he was afraid of Middleton, and the first time he met Nelson he told him about his meeting and agreement with Middleton. Witness was attached as a witness for the defense on the habeas corpus trial, and again in the trial of Harris. Pending those trials he associated and boarded at the same house with the other defense witnesses. Witness first told what he knew about this case to special Prosecuting Attorney Hodges on the day preceding this trial, which was the first time Hodges ever spoke to him about the case.

George Williams testified, for the State, that pending the election in November, 1884, he heard the defendant say that Black lied on him, and that in the fight which resulted therefrom he knocked Black down. After the killing of Black, and before the arrest of the defendant, the witness and Sheb Williams went into the Chickasaw Nation, and while there heard of the defendant's recent presence in that country. On his return to Paris the witness mentioned to the defendant that he

heard of him in the Chickasaw country, to which remark the defendant replied that he had been up there in search of the man who killed Black. He added that a white feather should be placed in the cap of the man who should succeed in capturing the murderer of Black. Immediately upon his return from Hot Springs, which was but a day or two after the murder of Black, defendant remarked, in the presence of the witness, that he would catch the murderer of Black if it took him always to do it.

Lewis Holman was the next witness for the State. He testified that he served defendant as deputy sheriff throughout his term of office. In February, 1885, the witness lived at his home on Emberson prairie. Yates came to witness's house one day in February, 1885, and told witness that defendant wanted witness to come to town, prepared for an absence of a week or ten days. Goodjoin came to witness's house later on the same day and delivered to the witness a similar message from the defendant. Witness went to Paris on the next morning and saw and talked to both defendant and Harris. He first met defendant in Schilling's saloon, where he was then tending bar. From that saloon the defendant and witness walked down Lamar Avenue to Britt's wagon yard. and to a point in the wagon yard behind a lumber pile. Defendant said to witness: "Yates has had a letter from that fellow, and we must do something to stop him from writing." He then remarked that he would see Harris and determine what to do, and he and witness separated. On the next morning witness, defendant and Harris met and went to the room of Morgan Crook, which was over the Schilling saloon. No other person was present. Defendant said: "We must do something to stop Middleton from writing, or we will be caught up with." A prolonged conference about the matter resulted in the decision that the witness should go to Wamego, Kansas, see Middleton and prevail on him to leave the country. The witness was selected as the messenger to Middleton upon the supposition that, residing in the country, his absence would not be so likely to arouse suspicion as would that of either the defendant or Harris, who lived in town. Defendant gave witness forty dollars and Harris gave him seventy, the former directing witness, if Middleton would agree to leave the country, to give him all the money except enough to get home on. Harris remarked that if Middleton would not leave the country, and witness would provide

the opportunity, he would kill Middleton. Defendant said nothing about killing Middleton. The witness left Paris on the twentieth day of February, 1885, and reached Wamego on the second day thereafter. He at once addressed a letter or note to John Howard announcing his arrival and his desire for a meeting, and appointing a place for the meeting. He expected Middleton to get that note. Hearing nothing from him, the witness dropped a second note in the post office a day or two later. Several days after that, hearing nothing from Middleton, he got the second note out of the post office, and decided to go home. He did not know what became of his first note to John Howard. On the evening of the sixth day after his arrival at Wamego, the witness went to the depot and bought a ticket on which to return, and was in the act of boarding the train when he was arrested by Jack Duncan and deputy sheriff Burris, for complicity in the murder of Black. When he got back to Paris the witness entered into an agreement with the county attorney to turn State's evidence, the said agreement being reduced to writing and formulated by Judge R. R. Gaines, who was the witness's counsel. The conditions of that agreement were that the witness was to testify truthfully and fully for the State, and was not to be prosecuted himself.

Witness did not see Middleton in Kansas or elsewhere on his said trip to Kansas. He saw him twice, however, after his escape from jail. The first time was at night, about ten days before the murder of Black. Newt Harris came to witness on the street and told him that Middleton was at the jail, and asked if witness did not want to see him. Witness went to the residence part of the jail, where Harris lived—Harris going with him. They found Middleton and Mrs. Harris in the north room up stairs. Defendant was not about the jail. Old Joe, the negro trusty, was somewhere about the premises, but witness did not know where. If old Joe saw Middleton that night, witness did not know it. After talking for some time, the witness went with Middleton to the southwest corner of the court house, where Middleton's horse was tied. That horse, as well as witness could tell at night, was a bright bay in color. While at the jail that night, the witness remarked to Harris: "I ought to arrest Middleton." Harris replied: "If you try it and Middleton don't kill you, I will." The witness next saw Middleton on the night of the Democratic jollification meeting, which was a very few nights before the murder of Black.

Witness went to the jail that night to lock up old Joe, and found Middleton in the kitchen. He said that he wanted something to eat. As there was nothing in the jail cooked, the witness went to the White Elephant saloon and reported the facts to Harris, who gave him fifty cents with which to buy supper for Middleton. Witness bought some bread, ham and fish, which he took to the kitchen to Middleton. While the latter was eating, witness asked him if he was going to kill Black. He replied he was. Witness asked him why he was going to kill him. He replied: "Harris is a good friend to me, and I will do anything he wants me to do." The witness's question was prompted by a remark previously made by Harris to the effect that if Black fooled with him he would make Middleton kill him. The witness was in the residence part of the jail on the Monday night following the murder of Black, and while there saw Middleton pass through the hall and go up stairs. Some time afterwards Newt Harris came home, and he, Mrs. Harris and witness went into the room where Middleton then was with Yates. The several parties named then had supper. Yates afterwards went off to lock up old Joe, leaving nobody present except witness, Middleton, Harris and Mrs. Harris. Middleton then said that he killed Black, and detailed the circumstances of the killing. He said that he rode up to Black's gate and hallooed, expecting Black to come to the door in which the light was burning, which was the west room; that Black came to the east door and put his head out; that he then asked if that was Mr. Black; that Black replied in the affirmative, and he shot him; that his horse jumped and he dropped the gun, that he got down and recovered the gun and then left, going east, then north and then west, and finally turning into the woods, where he soon got lost; that he then dismounted, hitched his horse to a tree and remained all night, and came to town next morning. He further stated in that conversation that while hiding in the woods that night he saw Bill Nelson and others trailing him, and cocked the gun to kill Nelson, but became afraid that he could not get away; that he afterwards hung the gun in a tree, where he left it.

Continuing, the witness stated that he met the defendant on his return from Hot Springs, a few days after Black was killed, and walked with him from the point where he left the street car to the jail. En route he told defendant that Middleton killed Black, and that he, Middleton, was at the jail on the

night after the killing. Defendant manifested surprise that witness knew anything about it, and remarked that it would not do be seen talking on the street, as they would attract suspicion. They went on to the residence part of the jail, where they found Harris. Defendant then took some shot and caps from his pocket and put them in a box in a drawer, asking Harris if the shot were like those with which the gun was loaded. Harris replied that he did not know, but that they would do. The shot were placed in the box so that, in case of search, the box would be found to be full. Harris said that he gave Middleton thirty dollars. The defendant, J. C. Hodges, witness, and, the witness thought, Captain Sam Johnson, ate dinner at Harris' house on that day. The witness did not aid in the search for the man who killed Black. He was at Sam Strawther's house when the news of Black's assassination was brought to town. Harris came after him and he went to town. He went to Blossom Prairie on the next night. Some time afterwards defendant went to the house of Buck Harris, Newt Harris' brother, in the Indian Nation, to find Middleton. The witness once asked defendant if any body saw him get the gun out of Schilling's saloon. He replied that he did not know; that he saw two strangers in the saloon at the time, but did not know whether or not they saw him take the gun. Witness did not tell defendant all that Middleton said about the killing of Black; he only told defendant that Middleton killed Black on Sunday night and was at the jail on Monday night.

On his cross examination the witness denied that when, en route to the Nation with Harris, he got to talking about the killing of Black, he told Harris that defendant had nothing to do with it, and had no previous knowledge of a purpose to commit the murder. He did not say that he did not believe defendant had anything to do with it. Witness did not remember telling Argyle Winn, near Brocen's store, that defendant was as innocent of the murder of Black as he was, and knew nothing about it. He remembered that, on the day of defendant's return from Hot Springs, he and defendant met Sterling Price, and that defendant asked him, witness, why he was not out looking for the party who killed Black. To that inquiry witness replied that he went to Blossom Prairie on the fatal night, and was treated like a dog. Defendant replied: "That makes no difference; you must go out and hunt the murderer of Black." Witness never saw defendant and Middleton

together, never heard them speak to each other, and did not know that defendant ever saw Middleton after his escape from the Paris jail in September, 1884. Witness once remarked to Harris, while Middleton was at large, that it would not do for defendant to know of Middleton's visits to the jail, to which remark Harris made no reply. Witness never heard Middleton say that it would not do for defendant to know of his visits to the jail while he was at large. The witness did not, prior to the killing of Black, tell defendant or any body else that he had seen Middleton in Paris after his escape. On each occasion that he saw Middleton he knew that he was an escaped prisoner, and knew that he had said he was going to kill Black. He did not, of course, know that Middleton would execute that threat, but he knew, as soon as he heard of the killing of Black, that Middleton did it. When, on Monday night, Middleton told about killing Black, he said nothing about any body being with him, but rather left the impression on witness's mind, if he did not actually say so, that he was alone. Witness left the jail that night between ten and eleven o'clock, leaving Harris, Mrs. Harris and Middleton together. He did not know whether Middleton remained there all night or not. The defendant was not in Paris on either of the occasions that Middleton visited the jail after escaping. Defendant, so far as witness was aware, knew nothing about Harris giving witness fifty cents with which to buy food for Middleton. Burris and Duncan, after arresting witness at the depot in Wamego, Kansas, took him to the hotel, where they told him that they had defendant, and Harris, Middleton and Yates, in jail, and that defendant had confessed, implicating witness in the murder of Black; that the defendant wanted to turn State's evidence, but that they were more anxious to secure the conviction of the defendant than that of the witness, and that, if witness would turn witness for the State, they would accept him in preference to defendant. Witness then told them in part what he has related on this stand, and finished the narrative to them en route to Paris. They reached Paris late on Saturday evening, when witness was hastily transferred to jail, where he was kept under guard, and allowed to see no person except the prosecuting lawyers, Jack Duncan, the detective, and Captain J. H. Wright, witness' nephew. Wright went to see Judge Gaines for witness, and the witness then entered into the agreement to turn State's evidence. Just before starting to Kansas wit-

ness borrowed one hundred dollars from the bank on the endorsement of Henry Miller, but he did not tell Miller he wanted to buy cattle with it for Jack Carter, who would pay the note as soon as he got back. He did not mention Carter's name.

Tom Nichols, recalled by the State, testified that he went into the White Elephant saloon on the night of the Democratic meeting after the November election in 1884, and saw Newt Harris and Sam Smith in there. Harris asked Smith: "Have you seen Jim Black to-day?" Smith replied that he had, and Harris asked: "Did he speak to you?" Smith replied: "No; we were too far apart." Harris then said: "I met him and he did not speak to me. I have got myself into a hell of a fix; Crook and Black are both mad at me." Some other talk was had, and when the said parties separated Harris said: "Never mind; I will have his d—d toes turned up," or perhaps it was: "I will have somebody's toes turned up." The witness did not know whether Harris was speaking of the defendant's or Black's or somebody else's toes, but he had just been talking about defendant and Black. Witness asked defendant, after the death of Black, if he was going to hold the office. He replied: "No; the people of Lamar county have said that they do not want me for sheriff, and I will not have the office."

Harry Miller testified, for the State, that he was in Wamego, Kansas, in February, 1885, and got a drop letter from the postoffice addressed to John Howard, which note he sent to Jack Duncan. Witness was then a detective.

After examining two or three other witnesses, and eliciting no new facts, the State rested.

L. B. Hunt was the first witness for the defense. He testified that he lived in Paris, and was city marshal in 1884, and until April, 1885. He was well acquainted with the State's witness Tom Christopher. Prior to the arrest of the defendant upon the charge of killing Black, the said Tom Christopher told the witness that while he was in jail he entered into an agreement with Middleton to kill Bill Nelson and Jim Black, because the former arrested Middleton and the latter surrendered him, Christopher, after signing his bail bond, and that after the death of Black he met Middleton on Pine Bluff street, when Middleton called upon him to carry out his part of the agreement, which he agreed to do. He said that defendant knew nothing whatever about the agreement between him and Middleton.

Cross examined, the witness said that the conversation between himself and Christopher occurred in the Mayor's office. Witness spoke of the matter to his son. He told H. B. Birmingham and Captain Gunn about Christopher's statement before the arrest of the defendant or Harris. Some time after the statement to witness in the Mayor's office, Christopher came to the witness with some letters he had received. He and witness then took the letters to Sheriff Gunn, and Christopher's previous statement was talked over. It was then agreed that the letters should be placed in the bank to be taken out only by either the witness or Gunn. They were placed in the bank on the twentieth day of January, 1885. After the arrest of Crook and Harris, the witness, with Christopher and J. M. Long, one of defendant's attorneys, went to the bank and got the papers. Witness gave them to Long and Long took them to Captain Lightfoot's office. Witness had not seen the said papers since he gave them to Long. A bundle of letters being handed to witness he identified it as the bundle of papers above referred to. The several letters contained in the bundle were brought to witness by Christopher at different times.

W. D. Nelson testified, for the defense, that prior to the arrest of the defendant, Tom Christopher told him that while confined in jail he entered into an agreement with John Middleton to kill the witness and Jim Black; that Middleton wanted to kill witness for arresting him and that he, Christopher, wanted to kill Black for surrendering him on his bond, and that he and Middleton agreed to help each other, and that Crook was no party to and knew nothing of said agreement. Christopher subsequently told witness that after the killing of Black he met Middleton on Pine Bluff street in Paris, when Middleton said to him: "Tom, I have killed Black, and I want you to get Nelson out so that I can kill him;" that he agreed to do so and went up town and pretented to hunt for witness and to be unable to find him; that meanwhile Middleton stood in the east door of the court house watching for witness, and came very near shooting Roland through mistake. Witness arrested Middleton for carrying a pistol, and afterwards caused him to be held for bringing stolen property into the State. Witness went to Blossom Prairie on the night that Black was killed. He found the track of one horse immediately in front of Black's gate, and the track of another horse about fifteen feet distant from the said gate. Leaving that place they went east, then

north and then west, traveling together, and were lost after entering the woods.   As shown by the tracks, one of the horses was much larger than the other.   Witness followed those tracks twice—the first time on the fatal night with Ryan, Gose and Booth.   It was a dark night, but they had a lantern. Hancock, Gose and Booth were with witness the second time. After the arrest of the defendant, the witness and Duncan, Gose and Tinnin went to the place pointed out by Mrs. Provine (now Mrs. Pickard) as the place where she saw a man and horse on the morning after the murder of Black.   They searched that place for a gun, but found none.   At the root of the tree where Mrs. Provine said she saw the man stooping they found a small rag which seemed to have fallen from a sore.   They did not look for a gun at a point about a half mile north from Reno.

J. M. Long testified, for the defense, that he had known defendant for thirty-five years.   The papers now handed to witness were certain letters that were taken from the Paris Exchange Bank by Hunt and Tom Christopher and turned over to witness by Hunt.   Witness was of counsel for defendant prior to the change of the venue in this case.   Witness was attorney for Christopher on his trial for forgery.   One day Christopher, in talking to witness about the murder of Black, told witness that, when in jail, he agreed with John Middleton to kill Nelson and Black; that he wanted to kill Black for surrendering him on his bond, and that Middleton wanted to kill Nelson for arresting him, and that they agreed to help each other.   In that same connection he said that the defendant knew nothing whatever about that agreement.   He also, at another time, told witness that, after the death of Black, he met Middleton at a bawdy house in Paris, when Middleton told him that he had killed Black.

D. E. Baker testified, for the defense, that pending this trial Tom Christopher told him, in Sherman, that subsequent to the killing of Black he met Middleton on Pine Bluff street in Paris, and that Middleton then told him that he had killed Black, and asked him to decoy Nelson to a place where he could kill him. Witness then asked him if defendant knew anything about his agreement with Middleton to kill Black.   He replied that defendant knew nothing about it, so far as he was aware.

O. F. Parish testified, for the defense, that he lived in Paris in November, 1884.   He then owned and had owned since 1869

a certain muzzle loading double barreled shot gun. The last time he saw that shot gun in the year 1884 it was standing behind the counter in Schilling's saloon. That was on the morning of November 14, 1884 — the morning after the last jollification of the Democrats that followed the general election. He was drinking on the night of the jubilee and did not know how the gun came to be in the saloon, except by hearsay.

Henry Schilling testified, for the defense, that he knew T. B. Enlow by sight, but did not know him on November 11, 1884. It was not true that Enlow or any body else, on the night of November 11, 1884, or at any other time, called his attention, in his saloon, to a man in the act of removing a shot gun from the said saloon. Cross examined, the witness said that he could not remember that he was in his saloon on the night of November 11, 1884. He did not remember seeing Enlow or Rodgers on that night. He would certainly remember it if his attention had been called to such a thing as the clandestine removal of a shot gun from his saloon. Witness knew that Captain Parish's gun was in his saloon for several days in November, 1884, but he did not know when nor by whom it was removed. No person came into the saloon on the said night and, leaning on the counter, talked to witness.

W. H. Gullick testified for the defense, that "Kicking Jim" gave him a muzzle loading shot gun one night in November, 1884, which he said he took from Captain Parish. Witness put the gun in Schilling's saloon.

Ed Thornton testified, for the defense, that he lived in Bonham, of which town he was city marshal in 1884. On or about September 24, 1884, witness received a telegram from Paris announcing the escape of John Middleton from jail. On the same day he saw the defendant in Bonham on the train bound east towards Paris. He had a prisoner named Chad in custody. Witness told defendant about the escape of Middleton, and that he had noticed a strange man about Bonham. Defendant appeared very angry when told of the escape of Middleton, and on the next day came back to Bonham in search of him. Meantime the strange man mentioned by him had disappeared.

Sterling Price testified, for the defense, that he met the defendant when he got off the train on his return to Paris from Hot Springs, a day or two after the killing of Black. Witness and defendant left the street car together and walked together across the square until they met Lewis Holman. When he

met Holman, defendant said: "Well, I suppose Black is killed. Do you know who did it?" Holman replied that he did not, and defendant asked him: "Why in the hell are you not out doing something and trying to find the party who did it?" Holman replied: "I went to Blossom Prairie on the night Black was killed, and as they treated me like a d—d dog, I did nothing more." Defendant said: "That makes no difference; you ought to be out hunting the man who killed Black." Witness left about that time, and did not know where defendant and Holman went.

Blake Hooks testified, for the defense, that he lived at Hooks's ferry on Red river, about thirty-five miles northeast of Paris. Early in the fall of 1884 a man suiting the description of John Middleton, accompanied by a negro, crossed into the Nation at witness's ferry. He had a shot gun with him. The negro went back. A few days later defendant came to witness's place looking for John Middleton, for whose arrest he announced a reward of fifty dollars.

Charley Johnson testified, for the defense, that he was a deputy sheriff under the defendant in 1884, and lived on Red river. A few days after the escape of Middleton from jail, the defendant came to the witness's house hunting Middleton. Alex Lowther was with defendant. From witness's house the witness, defendant and Lowther went to the vicinity of the house of Middleton's father, arriving at about eleven o'clock at night. They searched the farms, cotton pens and out houses until nearly day light, when they secreted themselves and watched the house until about sun rise, after which they hunted over adjacent fields and through the brush. The witness did not go into old man Middleton's house, and if either the defendant or Lowther did, the witness did not know it. Defendant offered a reward of fifty dollars for the capture of Middleton

Argyle Winn testified, for the defense, that in a conversation with Lewis Holman in Brocin's shop in Paris, the said Holman told him that defendant was as innocent of complicity in the murder of Black as he, the witness, was. On his cross examination this witness said that, on the occasion referred to, Holman overtook him on his way to Brocin's shop. Witness remarked: "Well, you boys will have to go to work now." Holman replied: "Yes, G—d d—n them, they have turned us out, but they know no more about how Black was killed than you do. Mack Crook is as innocent as you are." This last state-

ment was in reply to the witness's question whether defendant had anything to do with the killing of Black.

J. M. C. Yates testified, for the defense, that he lived in Lamar county, Texas, seven miles north east from Paris. On Sunday—the day of the killing at night—two men passed the witness's house, traveling from towards Paris. One of them asked for directions to Blossom Prairie, remarking that they were somewhat lost. They were then between three and four miles from the Blossom Prairie depot, and the time was an hour or two before sunset. The men were riding light bay or sorrel horses, one being considerably larger than the other. One of the men had a double barreled shot gun. The witness had no distinct recollection as to whether either man wore a beard, but thinks that one had a light mustache. That man was thirty or thirty-five years old. The other was probably somewhat older.

Isaac Nowlin testified, for the defense, that he lived seven miles northeast of Paris. On his way home from church, between two and three o'clock on the evening of the fatal Sunday, the witness met two horsemen who inquired the way to Blossom Prairie. He met them at Sugar Hill, about two miles from the place where the witness Yates stated that he saw two men. One of the said men was riding a fair sized light bay or sorrel horse, and had a double barreled shot gun. The other was riding a darker bay or light brown horse that was smaller than the other horse. The man on the small horse had a dark complexion, and a small dark mustache. He wore a dark colored suit of clothes and a dark colored slouch hat, and was between thirty and thirty-five years old. The other man had a light complexion and a heavy sandy mustache. He wore brown clothes and a light colored hat, and carried a double barreled shot gun.

H. B. Smith, for the defense, giving substantially the same description of the two men as that given by the witness Nowlin, said that he saw the said men at an old tie mill about a mile and a half from Blossom Prairie, at about half an hour before sun set, on the evening of the fatal Sunday. They asked him if they were on the right road to go to Blossom Prairie. The said men were strangers to the witness.

Alex Lowther testified, for the defense, that he lived in Paris in November, 1884. He spent the night of November 11, 1884, at defendant's house. Defendant returned from a trip on the

evening of that day, and was to, and did, start to Hot Springs on the next morning. He asked witness to go home with him that night, and to stay at his house with his children while he was gone. They went to the house before dark. Defendant went to bed about eight o'clock, and witness retired about nine o'clock, sleeping in the same bed. Witness knew that defendant did not leave his house on that night after dark. The object of this testimony was to contradict the testimony of Enlow, to the effect that defendant was the man who removed the gun from Schilling's saloon, between ten and eleven o'clock that night. The witness located the date—November 11—particularly, because, on the night that Black was killed, he counted back, and found it to be on the twelfth day of November that defendant left for Hot Springs—and it was the previous night that he slept with defendant at his house.

On cross examination, this witness was asked if he did not, on the habeas corpus trial, testify that his attention to the date on which he spent the night at Crook's house was first attracted by the testimony of Easton (Enlow?). Confronted with his written testimony to that effect, he admitted that he so testified, but declared that he then failed to remember the first time his attention was directed to the said date. The witness told Mr. Dudley, defendant's counsel, before the habeas corpus trial, that he spent the night of November 11, 1884, with defendant at his, defendant's, house. The witness did not then know Enlow. He was attached as a witness by the defense, but did not know what was expected to be proved by him until Enlow testified. The witness was upstairs over Schilling's saloon when he heard of the killing of Black. He did not know of any search for the murderer of Black being made by defendant or any of his deputies. He knew that defendant, during the inquest on the body of Black, went in a wagon with Captain Sam Johnson to the house of Threlkeld, in the Nation, to get a bale of cotton.

Mrs. Mack Crook, the wife of the defendant, testified that she went to Hot Springs, Arkansas, some time before the killing of Black, and being sick, wrote to the defendant to come and see her. He arrived at Hot Springs on November 13, 1884. On November 17, he received a telegram from his brother Lewis, informing him of the killing of Black, and he left Hot Springs by the next train to return to Paris.

Andy Gray testified, for the defense, that he was one of the

parties who went to Sherman in 1886 to attend the trial of this case, and was among the witnesses congregated at the depot in Paris waiting for the train. Several of the parties, including witness, defendant, Belcher, Sam Smith and Enlow, stepped out of the depot building to take a drink from a bottle of whisky that Smith had. While outside the depot Enlow, in the presence and hearing of witness, told defendant that on a previous hearing of this case he testified that he, defendant, was the man he saw get the gun out of the Schilling saloon, but that in so testifying he was mistaken, that he, defendant, was not the man he, Enlow, saw take the gun. Witness thought that Enlow was then pretty full of whisky, but not so drunk as not to know what he was talking about.

Dick Owen, conductor on the Texas & Pacific railway, testified, for the defense, that a day or two after the murder of Black, the defendant got off the Iron Mountain railway at Texarkana, and boarded his, witness's, train and traveled with him as far as Paris, Texas. Hot Springs, Arkansas, was about three hundred miles distant from Paris, Texas. The only direct route from Hot Springs to Paris was by the Texas & Pacific railway via Texarkana.

Richard Moore testified, for the defense, that Newt Harris was a bar tender in the White Elephant saloon in Paris, in November, 1884, and was on watch from and after six o'clock in the evening on the seventeenth day of that month. On his cross examination the witness said that he could not state positively who was on watch at the White Elephant saloon on the night of November 17, 1884. It was a custom for the man on watch, if he wanted to leave the saloon temporarily, to get some person to take his place on watch. It was the business of the bar tender to stay at his post during the period of his watch.

D. E. Booker testified, for the defense, that at no time on the night after Black's death did he relieve Harris on watch at the White Elephant saloon. Witness did not visit that saloon that night.

Harvey Boyd testified, for the defense, that he lived in Paris and was nineteen years old. He knew Tom Nichols, and was with him on Main street near Lynch's stable on the night of the last Democratic celebration after the election in 1884. Tom Nichols said nothing to witness about a jail bird on that night. Witness had seen John Middleton in jail and knew that Nichols did not meet Middleton on that night while he, witness, was

with him, Nichols. On his cross examination the witness said that he and Nichols, on the night in question, talked about two negroes who had recently escaped from jail. He and Nichols may have passed some body on the street near the stable on that night, but witness had no recollection of hearing Nichols say: "There goes a jail bird." He had no recollection of ever telling Birmingham that he was with Nichols when they met Middleton on that night.

John A. Gose testified, for the defense, that he went with Duncan and Nelson to Mrs. Provine's house, after the arrest of defendant, and from there, under the escort of Mrs. Provine, to the place in the woods where she claimed to have seen the man in the woods on the morning after the killing. They searched the neighborhood for a gun, but found none. Duncan found a piece of cloth which looked as if it had fallen or been removed from a sore. The place where Mrs. Provine said she saw the man was about three miles distant from Reno. The gun was not hunted for at a place a half or three-quarters of a mile above Reno.

Mr. Pope testified, for the defense, that he lived in Blossom Prairie and was at home when Black was killed. He heard the fatal shot fired, and shortly afterwards went to Black's house. He at once searched for tracks, and found the track of a horse in front of Black's gate. He trailed that track east and north and then west to a point in the woods where it appeared to stop. It appeared that the rider dismounted at that point. At a point beyond the point in the woods last mentioned, the track trailed by witness and the track of another horse came together, whence the two horses traveled in company. From that point the witness and others trailed the tracks of the said two horses to Slate shoals on Red river, sixteen miles distant from Blossom Prairie. One of the tracks thus trailed by witness was the same track found at Black's gate. There was another horse track near Black's house, but it was not a fresh track.

Mr. Martin testified, for the defense, that he lived within three-quarters of a mile of Blossom Prairie depot, and was at home on the fatal night and heard the fatal shot. Soon thereafter, three horsemen, one riding a gray horse, passed the witness's house, riding in a lope. One of the Dudley boys owned a gray horse, and witness afterwards learned that it was the Dudley boys who passed his house on that night.

Henry Miller testified, for the defense, that a short time be-

fore the arrest of defendant, he saw Lewis Holman in Paris, and at his request endorsed a note to the Paris Exchange bank for one hundred and eight dollars. Holman told witness that he was buying cattle for Jack Carter, and had found some exceedingly cheap cattle which he wanted to buy for Carter; that Carter was temporarily absent, but would soon be back, when he would take up the note. Witness afterwards paid that note, and had not as yet been reimbursed.

Lem Oakes testified, for the defense, that he lived in the Choctaw Nation, Indian Territory, about twenty-six miles from Paris. He represented his county in the Senate of the Choctaw Nation. A sallow faced young man came to the witness's house in the Choctaw Nation on the morning of November 17, 1884, and got his breakfast. He came on foot and had a slicker in his hands in which something, which the witness took to be a gun, was wrapped. He was a slender man and would weigh perhaps one hundred and sixty pounds. His eyes were dark gray or blue in color. His mustache, which was rather thin, was of a light brown color. He wore dark clothing and a slouch hat. His hair was light brown in color, and he would measure about five feet nine inches in height. Witness did not know him. On the evening of the same day the witness heard of the killing of Black on the night before.

James Spring testified, for the defense, that he lived in the Choctaw Nation and was the sheriff of his county. He heard of the killing of Black on the seventeenth day of November, 1884. On the morning of the said day, November 17, the witness saw a man on a sorrel horse near the house of Senator Lem Oakes. That man approached the witness from the direction of a piece of timber to the right of Oakes's house. He asked if witness could tell him where Doc Middleton and his hunting party were camped. Witness directed him to the said camp, which was near the Spence crossing of the Kiomitia river, about twelve miles distant. That man, whom the witness described substantially as Oakes described the man who took breakfast at his house, had a slicker with him, and a gun in a scabbard attached to the saddle, which the witness supposed was a Winchester rifle.

Daniel Miller testified, for the defense, that he lived in Kiomitia county, Choctaw Nation, and was a local preacher. About dark on the night of November 16, 1884—the night of the assassination of Black—a man came to the witness's house in the

Choctaw Nation, and asked to stay all night. He got his supper and had his horse fed, and then decided to leave, which he did after asking witness if a party of hunters were camped anywhere on Salt creek. That man was riding either a light bay or a sorrel horse. He had a slicker tied behind his saddle, and a Winchester in a scabbard attached to the side of his saddle. He was twenty-eight or thirty years old, and would weigh between one hundred and fifty and one hundred and sixty pounds. He was rather heavy of build, had dark hair and brown mustache, and wore dark clothing and a black slouch hat. Witness did not know him. The witness's said house was about thirty-five miles distant from Paris, and about as far from Blossom Prairie in Lamar county. The witness was positive about the date of that man's visit because Dick Lock spent the very next night at his house, and brought the news of the assassination of Black on the night before.

Dick Lock testified, for the defense, that he was in Paris on the sixteenth day of November, 1884. He started to his home in the Choctaw Nation on the next day, and spent that night at Daniel Miller's house. He told Miller that night of the murder of Black on the night before.

Lem Oakes, recalled by the defense, testified that Doc Middleton and a party of hunters, including John Threlkeld and Armstrong, were camped on Long creek, two miles beyond Salt creek, until the Thursday or Friday preceding the Monday morning on which the man described by witness when first on the stand came to witness's house. Doc Middleton was an uncle of John Middleton, and was the same Doc Middleton who, in 1884, lived on Tinnin's farm on Red river. He now lives in the Choctaw Nation.

Henry Campbell testified, for the defense, that he lived in the Choctaw Nation, and in 1884 was a United States deputy marshal. He knew where Doc Middleton and his party of hunters were camped on the Kiomitia river in the said Nation in 1884. He heard of the killing of Black on the Tuesday after the fatal Sunday night. He saw Doc Middleton's party in camp on Monday and Wednesday following the assassination. He crossed the Kiomitia river at the Spence crossing on the morning of the said Monday, and about noon was overtaken by John Middleton, who rode with him as far as a mile. John Middleton asked for and witness gave him directions to Doc Middleton's camp. He was riding a light bay or a sorrel horse,

had a Winchester in a scabbard attached to his saddle, and a slicker tied behind his saddle. Witness had then known John Middleton two or three years. The Spence crossing of the Kiomitia river was forty or fifty miles distant from Paris, Texas. This witness was severely cross examined, but adhered to his statement that he saw John Middleton at the Spence crossing of the Kiomitia river, in the Choctaw Nation, about noon on November 17, 1884, the day after the night of the assassination of Black. He had never known but the one John Middleton he then met, but did not know that he was the same John Middleton who escaped from the Paris jail in September, 1884. The general description of John Middleton, as given by this witness (and by the succeeding witness Kelly) corresponded with the description given by Oakes, Spring and Miller of the man they saw at the times mentioned in their testimony.

Dick Kelly testified, for the defense, that he lived in Wheelock, in the Choctaw Nation. Witness knew John Middleton, and last saw him on the night of Monday, November 17, 1884, at the house of Stephen Frazier, in the Choctaw Nation, where Middleton got supper and had his horse fed. On the following Wednesday the witness heard of the killing of Black on the preceding Sunday night. Frazier's house was about fifteen miles distant from Daniel Miller's house, and about twenty-five miles distant from Senator Oakes's house.

Four witnesses for the defense testified that they were acquainted with the State's witness Christopher, and knew his reputation for truth and veracity. It was bad, and such as not to entitle him to credit on oath.

The defense closed.

The State, in rebuttal, read in evidence the testimony of Doc Middleton as delivered on the examining trial in February, 1885. It is as follows: "I resided during last September on the river, about a mile, I think, below Tinnin's, and about twenty miles from Paris. I saw John Middleton at night, about two or three days after he got out of jail. I saw him between my place and his father's. I do not know of my own knowledge where he had been that day. Some time during that day he came to my house and got a gun. He took it without my permission, and I don't suppose he stayed there long after that. That was the last time I ever saw him. His parents then lived about

three hundred yards from me. They moved away after the killing of Black."

Two witnesses testified for the State, in rebuttal, that they had known Harvey Boyd all his life, and that his reputation for truth and veracity was bad. One of the said witnesses did not consider him entitled to credit on oath, while the other was unwilling to impugn his reputation to that extent. A third witness testified that Harvey's reputation for truth and veracity as a boy was bad, but he had not heard it discussed in later years.

R. F. Scott and T. W. Carlock testified, for the State, that they saw Newt Harris in Paris on the day of the general election, electioneering for the defendant, who was a candidate for sheriff.

R. R. Hazlewood testified, for the State, in rebuttal, that he lived in Delta county ten or twelve years, and had been acquainted with L. B. Enlow about fourteen years. Enlow's reputation for truth and veracity had always been good in Delta county.

The defense witnesses Campbell and Kelly, having testified that the John Middleton they knew had no remarkable peculiarity of form or feature, was not stoop shouldered nor in the habit of looking down or away from a person with whom he conversed, and that his cheek bones were not materially high, nor his face particularly full or long, the State introduced Messrs. Hugh Tinnin and Henry Warren as rebutting witnesses. They testified that the John Middleton who escaped from the Paris jail in September, 1884, and who was charged with the murder of Black, was a young man about twenty-eight or thirty years old. He was about five feet and ten inches in height; had dark hair and a thin mustache somewhat lighter in color than his hair; a full face, high, sloping and broad forehead, particularly high cheek bones, short chin and blue eyes. He had a peculiar expression of the eyes, and seemed to be unable to look a person in the face while talking to him. His shoulders were wide—much wider than he was across the hips, and were somewhat stooped. His neck appeared to start out of his shoulders too low down on his breast.

*J. G. Dudley, Maxey, Lightfoot & Denton, H. D. McDonald, W. B. Wright,* and *Silas Hare,* filed able and exhaustive briefs and arguments for the appellant.

*W. L. Davidson,* Assistant Attorney General, and *J. C. Hodges,* for the State.

WILLSON, JUDGE.    Eliminating surplusage from that portion of the indictment which charges the defendant and Newt Harris with being accomplices to the murder of James H. Black, it reads as follows: "That about November 12, 1884, in said county and State, one Mack Crook and one Newt Harris did unlawfully, and with their express malice aforethought, advise and encourage the said John Middleton to commit said offense of murder before the said John Middleton did kill and murder the said James H. Black, and did prepare and furnish said John Middleton with a gun for the purpose of aiding and assisting the said John Middleton in killing and murdering the said James H. Black as aforesaid; and the said Mack Crook and the said Newt Harris was not present when the said John Middleton killed and murdered the said James H. Black as aforesaid." We regard the above as a single count, and while it is not framed in strict accordance with precedent, and is not critically correct, it is, in our opinion, substantially sufficient, and the trial court did not err in overruling the defendant's exceptions to it.

In a prosecution against a defendant charged as an accomplice, it is essential for the State to establish the guilt of the principal of the crime charged to have been committed by him. In this case it was essential for the State to establish the guilt of John Middleton, the alleged principal of the murder of James H. Black. Without proof of Middleton's guilt as principal, the defendant could not be convicted as an accomplice. In establishing the guilt of Middleton any evidence which would have been competent, had he been on trial, was competent on the trial of the defendant as an accomplice, not for the purpose of proving that defendant was an accomplice, but for the purpose solely of proving that Middleton committed the murder, and the degree of the murder. (Penal Code, art. 89; Arnold v. The State, 9 Texas Ct. App., 435; Poston v. The State, 12 Texas Ct. App., 408; Whart. Cr. Ev., sec. 602.)

If Middleton had been on trial his detailed confession made to Holman would have been admissible in evidence against him, and was therefore admissible evidence in this case to prove his guilt as principal in the murder of Black, but not to prove that the defendant was an accomplice in that murder, or

had any guilty connection with it.    It was not error, we think,
to admit the testimony of the witness Holman, detailing the
confession of Middleton.    In the charge to the jury, the purpose
for which this testimony was admitted was clearly explained
to the jury, accompanied by the emphatic instruction that it
could not be considered against the defendant for any purpose,
but could only be considered for the purpose of showing that
Middleton may have killed Black.    These remarks are appli-
cable also to the testimony of the witness Christopher, detailing
Middleton's confession made to him of the murder of Black.
(Simms v. The State, 10 Texas Ct. App., 131.)

It is claimed by defendant as error that the acts, declarations
and statements of Newt Harris, and the conversation between
Holman, Harris and Middleton, as detailed by the witness Hol-
man, were admitted in evidence against him, he not having
been present at the time of the transpiring of said acts, de-
clarations, statements and conversation, and it not being shown
that a conspiracy existed between him and Harris, Holman
and Middleton to murder Black.    This testimony was clearly
hearsay, and was inadmissible except upon the predicate of
the existence of such a conspiracy.    It was the province of the
trial judge primarily to determine whether the predicate which
would render the testimony admissible had been established by
the evidence.    He concluded that the predicate of conspiracy
had been laid, and admitted said testimony.    We shall not de-
termine whether or not this conclusion of the trial judge is sus-
tained by the evidence.    It is only necessary to say that the
sufficiency of the predicate laid for the admission of said tes-
timony was a question in the case and a vital one, and that
question should have been submitted to the jury with instruc-
tions to disregard said testimony in case they were not satis-
fied from other evidence in the case, that the conspiracy upon
which the admissibility of said testimony depended had been
proved.    (Loggins v. The State, 8 Texas Ct. App., 434.)

The jury should, in this connection, have been further in-
structed that such conspiracy could not be established by the
acts or declarations of a co-conspirator made after the consum-
mation of the offense and in the absence of the defendant.
(Cohea v. The State, 17 Texas Ct. App., 153; Menges v. The
State, 25 Texas Ct. App., 710.)    With respect to said testimony
the charge of the court is materially defective in the particulars
above mentioned.    Special charge fourteen, requested by the

defendant, reads as follows: "No acts or declarations of John Middleton or Newt Harris or Lewis Holman, made after the killing of Black, can be considered by you in determining whether the defendant furnished or assisted in furnishing the gun to John Middleton for the purpose of killing Black, and unless you find from the evidence some testimony outside of such declarations tending to connect Mack Crook with the offense, you will find him not guilty." This charge should, we think, have been given. It was abstractly correct, and was called for by the evidence in the case.

Defendant's bill of exceptions number thirty-four, relating to the remarks of the trial judge, made to counsel in presence and hearing of the jury, upon the admissibility of certain evidence offered by the State, is well taken. The remarks were in violation of article 729 of the Code of Criminal Procedure, and might have prejudiced the rights of the defendant. Pending the discussion and decision of the admissibility of said testimony, the jury should have been retired from the court room. (Moncallo v. The State, 12 Texas Ct. App., 171; Wilson v. The State, 17 Texas Ct. App., 525; Rodrigues v. The State, 23 Texas Ct. App., 503.)

It was not error to permit the State to prove that the general reputation of the witness Enlow for truth and veracity was good. Said witness was a stranger in the county of the trial, and his credibility had been attacked by the defendant by showing, or attempting to show that he had made statements contradictory to his testimony on the trial. (Coombs v. The State, 17 Texas Ct. App., 258; Phillips v. The State, 19 Texas Ct. App., 158; Williams v. The State, 24 Texas Ct. App., 637.)

It was not error to admit in evidence the testimony of the witness Threlkeld, taken before the examining court. A proper predicate was laid for the admission of said testimony. It was shown that said witness resided beyond the limits of this State. The fact that he was a non-resident of this State at the time said testimony was taken does not render it inadmissible. (Code Crim. Proc. arts., 772, 773, 774; Willson's Crim. Stats., sec. 2535.)

It was not error to refuse to permit the defendant to prove the declarations of Jack Duncan in regard to the gun. This was hearsay testimony. Defendant should have called Jack Duncan to testify about the gun.

There are some other exceptions reserved by the defendant

to the rulings of the court admitting testimony offered by the State, but they are either embraced in the exceptions already discussed, or are immaterial, and hence we will not specifically notice them. We have discussed and determined such of the exceptions as in our opinion are of any importance.

Numerous objections are made by counsel for the defendant to the charge of the court. We shall notice such only as appear to us to be maintainable. It was unnecessary and improper to define in the charge an assault, and a battery, though this was an immaterial errror; but it was excepted to by the defendant at the trial, and thereby became reversible error. An assault and battery was necessarily included in the act of killing, and in defining murder a sufficient definition of assault and battery was embraced for the purposes of this case, and a further and specific definition of the offense of assault and battery could only tend to encumber the charge, and confuse the minds of the jury with matter not pertinent to the issue being tried by them.

In all trials for murder it is the imperative duty of the court to instruct the jury as to the meaning of "malice," or "malice aforethought." It is fundamental error to omit such instruction, and a definition of "express malice" will not cure the omission. (Willson's Crim. Stat., sec. 1061.) In this case the charge fails to explain the legal meaning of "malice aforethought."

In the charge "express malice" is defined to be "where one with a calm, sedate and deliberate mind and formed design kills another." This definition is incomplete and incorrect. Justifiable or excusable homicide may be committed with a calm, sedate and deliberate mind, and a formed design to kill another. The definition should have been "where one with a calm, sedate and deliberate mind and a formed design *unlawfully* kills another," etc. (Pickens v. The State, 13 Texas Ct. App., 351.)

Upon the issue of *alibi* as to the principal, Middleton, the charge is defective. It requires the jury to believe from the evidence that Middleton was not present at the time and place that Black was killed, when the correct rule is that if the evidence raised in the minds of the jury a reasonable doubt as to his presence at said time and place, he should be found not guilty. This imperfect charge was excepted to by the defend-

---

---

ant, and is therefore reversible error. (Wilson's Cr. Statutes, sec. 2343.)

In other respects than those we have specified, we think the charge of the court is full, fair, correct, and remarkably pertinent to the facts, and plain to the common understanding. It explains very fully and clearly the rules relating to accomplice testimony, defining who are accomplices within the meaning of Article 741, Code Crim. Proc., and it applies those rules not only to the defendant's connection with the offense, but to the connection therewith of the alleged principal, Middleton.

It was not essential, though proper, that the charge of the court should instruct the jury in the forms of verdicts which they might render in the case. (Williams v. The State, 24 Texas Ct. App., 637.) The form of a verdict of guilty, as prescribed in this case in the charge of the court, is, we think, unobjectionable, and the verdict is in accordance therewith. The indictment did not charge the defendant with the murder of Black, but with being an accomplice to said murder. Being an accomplice to a crime is a distinct offense, specifically defined in our code. (Penal Code, Art. 79.) The accomplice is punishable in the same manner as the principal offender. (Ibid, Art. 80.) The jury could not legally have found the defendant guilty of any offense but that charged against him in the indictment, which was the offense of being an accomplice to murder in the first degree. We are unable to perceive the force of the objections made to the verdict.

As to the sufficiency of the evidence to support the conviction, it being unnecessary to a disposition of this appeal that we should pass upon that question, we shall refrain from doing so, as on another trial of the case the evidence may be essentially different from that now before us.

Because of the several errors in the rulings and charge of the trial court, which we have specified, the judgment is reversed and the cause is remanded.

*Reversed and remanded.*

Opinion delivered February 9, 1889.

Judge Hurt is of the opinion, that being an accomplice to a crime is not a specific offense; that the accomplice is guilty of the offense committed by the principal.